**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

---

SRF TECHNOLOGY LICENSING

EUROPE EAST, LLC,

        Plaintiff,

        v.

                            **Civil Action No. _____**

ZERO GLOBAL WASTE, LLC;

ZERO GLOBAL WASTE CROATIA d.o.o.; and

CURTIS BOSTIC, individually,

        Defendants.

---

**COMPLAINT FOR EQUITABLE RELIEF,**

**DECLARATORY JUDGMENT, AND DAMAGES**

**NATURE OF THE ACTION**

1.　　Plaintiff SRF Technology Licensing Europe East, LLC ("SRF" or "Plaintiff") brings this action for equitable relief, declaratory judgment, and damages arising from Defendants' systematic failure to safeguard proprietary technology entrusted to their custody. SRF supplies proprietary process components under an equipment supply agreement to Defendant Zero Global

Waste, LLC ("ZGW"). These components are designed to practice a proprietary process known as Dynamic Organic Repolymerization ("DOR") for the conversion of mixed carbon feedstocks into engineered materials. Plaintiff supplies core components, which systems and facility integrators, such as Defendants, set up as process lines that manufacture proprietary materials. ZGW's right to use the DOR process, the components, and to manufacture the products, is conditional on its purchase of components from SRF and its compliance with the operative agreements; these rights are strictly limited to use on the components supplied by Plaintiff. In exchange for minimum performance requirements and other commercial commitments, ZGW has enjoyed many years of exclusive rights to a large territory without having to pay upfront fees. After successful commissioning of the first manufacturing line running the DOR process, ZGW's CEO Jeffory Blackard wrote in December 2020 that he anticipated ZGW could purchase and run up to 5,000 such systems' worth of components within five years, for their exclusive territory alone. At the pricing established at that time, the equipment revenue from ZGW would have been nearly or exceeding $5 billion. The contractual royalties to Plaintiff, based on even the lowest-value product scenario, would have yielded over $450 million per year, excluding carbon credits or other revenue streams. Over the 25+ year useful life of the equipment, this would have meant billions of dollars. Instead, those five years have come and gone. ZGW was entrusted with the world's first EGS-5000L system set (now called the "Rhino"), which today sits idle in a facility in rural Croatia, unsecured, noncompliant with EU regulations, and under the control of a person convicted of financial crimes and sentenced to 2.5 years in prison.

2.     Plaintiff does not know what has been built at this facility. Plaintiff does not know what modifications have been made to its components. Plaintiff does not know what heat sources have been connected, what process is actually running, or whether its components are being

operated within their design parameters. Plaintiff recently discovered that ZGW provided a media statement in Croatia stating the process is "vacuum pyrolysis at 240°C", which is not Plaintiff's technology. Plaintiff has been systematically excluded from any meaningful visibility into the facility since delivering its components many years ago, for use at a different location. Now, the person convicted of crimes in Croatia, acting with express board authorization from ZGW's Board, which consists of former United States Senator Rick Santorum, Providence Energy's CEO Michael Allen, and Jeffory Blackard, are attempting to induce Plaintiff, or even the CEO of the parent company personally, to sign a document that would retroactively designate Plaintiff as the manufacturer of whatever it is Defendants have built at their Novi Marof facility in Croatia ("Novi Marof").

3.      This is not the first time Defendants have attempted to weaponize regulatory obligations that are, and have always been, solely theirs. As a systems and facility integrator in Croatia, one or more of the Defendants' are responsible for CE (Conformité Européenne) compliance as well as other regulatory requirements. In 2022, on information and belief, they moved machinery components that constitute Plaintiff's technology to a site they procured in 2021, along a high-pressure gas line in Croatia. A representative of Plaintiff was permitted a visit in early 2022, around four years ago, and confirmed Plaintiff's components were present; Plaintiff has not been part of whatever has been built there since. European regulations are clear, under EU Machinery Directive 2006/42/EC and Regulation (EU) 2023/1230, whichever was in effect depending on when they did whatever work has been done, one or more of the Defendants is the manufacturer of the final installation bearing responsibility for CE marking and regulatory compliance. Yet, by fall of 2022, as part of a broader pressure campaign, ZGW's Croatian legal representatives threatened Plaintiff with criminal proceedings in Croatia and the European Union

over CE compliance, pertaining to the prior installation ZGW set up in Varazdin, Croatia. Those obligations belonged to ZGW. To end this weaponization, Plaintiff insisted as a condition of entering into new February 2023 agreements with Defendants, they explicitly acknowledge their CE obligations in writing. The Defendants themselves agreed, that if they failed to comply with European regulations, they must promptly return the equipment to Plaintiff at their expense. More than three years have now passed. No CE marking has been obtained. A few weeks ago, a Board member's son, William Allen of Providence Energy, who is actively involved with ZGW's operation and management, stated that their facility had been run at least twice on a "dry" (non-production basis) but blew their own transformers and, in any case, remained unpermitted for its final purpose. Plaintiff was not made aware of these operations nor was involved. Now, ZGW is attempting yet another bad faith maneuver, this time trying to induce Plaintiff to sign away its protections by accepting "manufacturer" status for an installation that Plaintiff did not build nor even knows what is and, possibly, may cause serious hazards. A transformer failure often occurs due to lightning strikes, insulation breakdown, or external damage. Plaintiff is aware of a transformer failure at Defendant's prior site as well, which then was represented to be due to a failure to properly insulate during the winter. Serious safety hazards exist when transformers blow, including explosion and fire, which is extremely concerning given Novi Marof's location directly on the high-pressure gas line. In recent weeks, a local organization concerned about safety reached out to Plaintiff showing pictures from inside the facility, which demonstrates the lack of security of Plaintiff's technology, but also highlights the community concern.

4.      Plaintiff seeks equitable and declaratory relief to protect its intellectual property, obtain immediate inspection access for an authorized representative, stop Defendants from misrepresenting Plaintiff's technology and continuing their pattern of bad faith regulatory

manipulation, and enforce the return of proprietary components that Defendants have failed to protect, failed to operate, and are now attempting to mischaracterize as Plaintiff's regulatory responsibility. The return of these components is hardly an extraordinary remedy. It is the precise remedy Defendants themselves agreed to when they signed the Existing Equipment Agreement, specifically because their prior conduct demonstrated they could not be trusted with possession. This action is brought pursuant to the exclusive forum selection provisions of the Existing Equipment Agreement and the Mutual Release, each with no mediation prerequisite, and pursuant to Section 9.08 of the Fourth MLA, which permits equitable relief in this Court at any time.

## THE PARTIES

5.      Plaintiff SRF Technology Licensing Europe East, LLC is a limited liability company organized under the laws of Delaware. SRF is the licensor of patented waste conversion technology and the owner of intellectual property rights licensed to ZGW under the agreements described herein. SRF is a wholly owned subsidiary of Ecogensus, LLC ("Ecogensus"). Ecogensus is the entity through which certain exclusive territory rights for equipment supply and technology licensing have been provided to Defendant ZGW. Neither SRF nor Ecogensus nor any of its affiliates has any European customers (except to the extent ZGW has subsidiary operations in Croatia), nor has ever sold a complete integrated system to any European purchaser, nor has ever delivered equipment for European destination other than those components in ZGW's possession.

6.      Defendant Zero Global Waste, LLC ("ZGW") is a limited liability company organized under the laws of Texas, with its principal place of business at 401 Adriatic Parkway, McKinney, Texas 75071. On information and belief, the members of ZGW include Lee Beaman of Tennessee, Providence Energy, Inc. of Texas, former United States Senator Rick Santorum of Virginia, Curtis Bostic of South Carolina, and CEO Jeffory Blackard of Texas, amongst others.

ZGW holds an equipment supply and license agreement from SRF, under the Fourth Amended and Restated Master License and Equipment Supply Agreement dated February 2, 2023 (the "Fourth MLA"). ZGW is represented in a pending AAA mediation by Austin Champion of Champion LLP, 2200 Ross Avenue, Suite 4500W, Dallas, Texas 75201 that pertains to contractual performance.

7.      Defendant Zero Global Waste Croatia d.o.o. ("ZGW Croatia") is a Croatian company and wholly owned subsidiary of ZGW. ZGW Croatia is a named party to the Existing Equipment Supplemental Agreement (the "Existing Equipment Agreement"). The definition of "ZGW" in the Existing Equipment Agreement expressly includes ZGW Croatia and "any affiliates or subsidiaries thereof, and all directors, managers, shareholders, members, partners, employees, officers, agents, heirs, executors, administrators, successors and assigns, representatives, attorneys, insurers and fiduciaries of the foregoing." ZGW Croatia has day-to-day physical custody of the Existing Equipment.

8.      Defendant Curtis Bostic ("Bostic") is an individual who is, on information and belief, a citizen of South Carolina. Bostic is a shareholder of ZGW. In or around January 2026, Bostic was introduced to Plaintiff's representatives by Austin Champion of Champion LLP, ZGW's counsel. Will Allen of Providence Energy, Inc., a large investor in ZGW, separately explained that Rick Santorum, a ZGW Board member, shareholder and long-time friend of Bostic, had asked Bostic to get involved personally and see if he could resolve matters. On information and belief, Bostic's involvement was requested by Santorum to pursue an alternative approach to the ongoing dispute. Bostic identified himself as a shareholder who spoke for the broader interests of ZGW's investors and partners. In late January 2026, Bostic requested and traveled to New York City for an in-person meeting to pursue commercial discussions on behalf of ZGW's investor group. This trip was not incidental: Bostic insisted on traveling to New York to pursue strategic

discussions, then traveled through a major snowstorm specifically to advance negotiations regarding the scope and future of ZGW's license and a potential acquisition of Ecogensus's technology. Bostic's substantive discussions in New York took place in two separate locations, and then and thereafter were commercial in nature, addressing deal terms, valuation, and acquisition structure. Another ZGW representative, Benjamin "Jed" Rollins, also traveled to New York to discuss the relationship. Bostic falls within the contractual definition of "ZGW" in the Existing Equipment Agreement, which includes "shareholders," "representatives," and "agents." Bostic voluntarily assumed the role of speaking on behalf of the broader ZGW enterprise in pursuit of its strategic goals, in connection with the disputes arising under these agreements, as an active co-owner and operator, thereby bringing himself within the scope of the forum selection and substantive provisions that govern those disputes. The contractual definition of "ZGW," which expressly includes shareholders, representatives, and agents, reflects the parties' recognition that the obligations under these agreements extend to those who act on behalf of the contracting entity, not merely to the entity's corporate shell. Bostic is not a passive or incidental person within that definition. He is an active co-owner who voluntarily inserted himself into the contractual relationship, assumed the role of ZGW's strategic commercial representative, and committed the acts alleged herein in furtherance of that role. On February 25, 2026, Bostic made false representations to Plaintiff regarding purported European lawsuits, as described herein.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, as this action includes claims arising under the Defend Trade Secrets Act, 18 U.S.C. §1836 et seq. This Court has supplemental jurisdiction over all related state law claims pursuant to 28 U.S.C. §1367. This Court additionally has subject matter jurisdiction pursuant to 28 U.S.C. §1332. Plaintiff is

informed and believes, and is continuing to investigate, that complete diversity of citizenship exists among the parties and their respective members. On information and belief, no member of Plaintiff or Plaintiff's parent shares citizenship with any Defendant or any member of any Defendant. The amount in controversy exceeds $75,000, exclusive of interest and costs.

10.    Venue is proper pursuant to three independent contractual forum selection clauses:

(a)    Section 3.05 of the Existing Equipment Agreement provides exclusive SDNY jurisdiction for all disputes arising out of or in connection with that Agreement, including "title disputes relating to Existing Equipment, or the use and possession of the Existing Equipment." There is no mediation prerequisite.

(b)    Section 9.08 of the Fourth MLA permits Licensor to bring an action seeking equitable relief in this Court "at any time," including while mediation is pending. This Complaint seeks equitable and declaratory relief. The disputes in this action are fundamentally interconnected with the agreements that select this Court. Bostic entered the dispute because of these agreements, traveled to New York to discuss the future of the license under these agreements, and fabricated claims concerning the technology that is the subject of these agreements. His conduct did not occur in a vacuum unrelated to the contractual relationship; it arose directly from and in connection with it. Unlike cases where a defendant's New York contact was social or incidental, Bostic's trip to New York was specifically and exclusively to pursue strategic commercial negotiations about the license and a potential acquisition, and the claims asserted herein arise directly from the commercial relationship Bostic purposefully pursued in this District.

(c)    Section 4.07 of the Mutual Release provides exclusive SDNY jurisdiction for all disputes arising under the Release. There is no mediation prerequisite.

## FACTUAL ALLEGATIONS

### A.    The Technology

11.    Ecogensus developed a proprietary patented technology for the conversion of mixed carbonaceous feedstocks, including municipal solid waste, into engineered materials through a proprietary process known as Dynamic Organic Repolymerization ("DOR"). The technology is the subject of multiple issued patents in the United States and internationally. The DOR process is a constructive thermochemistry process to create physical materials, such as composite lumber. Pyrolysis, which Defendants state they are practicing, is a high temperature destructive thermochemical process to produce primarily gas (syngas) and liquid oil, with residual char residues. If Defendants are utilizing Plaintiff's components for some modified pyrolysis process, this would be far beyond the design parameters of those components and possibly very dangerous and they must cease and desist immediately. If Defendants are separately using another pyrolysis technology, of concern as Providence Energy has invested in a waste pyrolysis company called Monarch Waste Technologies, then Plaintiff has remained trapped in an exclusive agreement under false pretenses.

### B.    The License and Broken Promises

12.    Beginning in 2017, ZGW licensed the technology in question for certain territories focused around Eastern Europe. The arrangement was premised on ZGW's representations that it possessed the facility infrastructure, financial resources, and technical capability to act as a competent system integrator and facility integrator for the first commercial-scale 5000-liter

processor line (the "EGS-5000L"). In exchange for being the first licensee to receive these system components, ZGW agreed to provide operating data, visitation rights, and other benefits that would accrue to Plaintiff from having its technology demonstrated in a commercial setting.

13.    ZGW's CEO, Jeffory Blackard, showed Plaintiff photographs and blueprints of a facility that he represented was being prepared for the technology. Plaintiff has recently investigated and determined, on information and belief, that the photographs depicted the Tehnix-eko facility in Donji Kraljevec, Croatia, which officially opened on May 25, 2018, a facility that was neither owned nor controlled by ZGW. The blueprints shown by Blackard in 2017, however, were on information and belief, drawings of a Höcker Polytechnik GmbH installation, a subcontractor to the Mariscina County Waste Management Centre, a facility that had already been constructed. CEO Blackard made reference to the "Technic" or "Teknik" facility, but Plaintiff's investigation has now revealed that Blackard was either confused or deliberately conflated two different facilities in order to mislead about ZGW's readiness. In neither case was ZGW the owner, operator, or developer of the facility depicted.

14.    When the initial plans, or what Blackard at least represented was the plan, did not materialize, then ZGW informed Plaintiff it would instead use an existing operating facility owned by a third-party host with whom they were pursuing a strategic joint venture. ZGW represented that this facility offered advantages due to the joint venture and prominence of the owner as a major recycler and waste management operator in the region. However, ZGW was unable or unwilling to provide the specifications and facility parameters that Plaintiff required for proper engineering coordination. ZGW repeatedly instructed Plaintiff to manufacture components to any standard. At a meeting in New York City that ZGW requested in 2018, Senator Santorum, the Croatian employee now convicted in a Croatian court, and Jeffory Blackard became combative, stating that

any choice of specification should be randomly made, and ZGW would thereafter employ local electrical, plumbing, contractors to build their system and facility.

15.     Plaintiff reluctantly developed components to the extent possible based on standard assumptions, in reliance on ZGW's representations that it, or the host facility, would have teams of contractors available to complete integration and address any interface issues. ZGW was at all times the system integrator and the facility integrator. ZGW engaged its own electrical, plumbing, and mechanical contractors; ZGW independently procured components including ones that Plaintiff is aware that include a chiller, transformer(s), ductwork, piping, wiring, conveyors, electrical panels and switchgear; and ZGW directed and controlled the assembly of these elements into an operational installation. Plaintiff supplied proprietary process components. All of this occurred at the original site, in the time period from 2019 to 2020.

### C.    CE Marking: Weaponization, Agreement, and Continued Non-Compliance

16.     EU Machinery Directive 2006/42/EC, then in effect, assigns responsibility for conformity assessment, technical file preparation, issuance of the EU Declaration of Conformity, and CE marking to the entity that assembles partly completed machinery into a finished installation and puts it into service. That entity is the manufacturer of the final installation for regulatory purposes. ZGW oversaw all integration work. ZGW is the manufacturer. This obligation exists independently of any contract between the parties.

17.     On information and belief, ZGW never obtained CE marking at the first host facility where the equipment was initially installed and commissioned. Senator Rick Santorum, Board member of ZGW, represented that an "R&D exemption" excused the regulatory requirements. This may be true, and if so it may have relieved Defendants of certain requirements in 2019-2020, but then when ZGW purchased the Novi Marof site in 2021 and moved components (including the

proprietary components supplied by Plaintiff) it would have triggered a new CE and regulatory requirement for whatever they set up there.

18.     Yet, in October 2022, one of Defendant's legal representatives in Croatia wrote threatening communications referencing the *prior* location, which by then Defendants had long since vacated, stating it would pursue "misdemeanor and/or criminal proceedings" against Plaintiff's parent company for so-called "omissions and violations" at that site , which would have been Defendants' responsibility anyway. In other words, rather than fulfilling its regulatory obligations at its new location, ZGW weaponized the issue. The obligation always belonged to ZGW as the integrator, but now ZGW was using its physical possession of Plaintiff's components as leverage: comply with our demands, or face criminal exposure in a foreign jurisdiction. When Plaintiff explained that it could not be held responsible for their local regulatory requirements, ZGW's CEO Blackard stated that "we know the judge in Varazdin very well." This was not the only time Blackard referenced influence, including judicial influence in Croatia. Plaintiff sought legal advice in the region, which confirmed that it was reasonable to be concerned about Blackard's influence and veiled threats.

19.     During negotiations for the February 2023 Agreements, Plaintiff insisted on an unambiguous written resolution. The result was Section 2.02 of the Existing Equipment Agreement, which expressly assigns to ZGW all expenses relating to the Existing Equipment "including but not limited to the application of CE marking." Critically, the Existing Equipment Agreement also provides at Section 2.07 that if ZGW ceases business operations, it must cause the equipment to be "safely disassembled and conveyed to the United States into the custody of SRF" at ZGW's sole cost and expense. This return provision was not incidental. It was the remedy Plaintiff demanded specifically because ZGW had already demonstrated it would use possession of

the equipment as a weapon. The only way to protect that weapon was to ensure that continued possession was conditioned on compliance, and that failure to comply would require return.

20.     More than three years have passed since ZGW made that commitment. Plaintiff finally confirmed unequivocally on Friday, March 13th 2026, that ZGW has not obtained CE marking. This confirmation was made from ZGW's local Croatian head of operations, Mladen Jozinović, directly. On information and belief, ZGW has not operated the equipment commercially. As stated by Will Allen of Providence Energy in recent weeks, ZGW has not obtained a waste processing permit. Plaintiff has learned from major reputable media outlets in Croatia that Jozinović was convicted of financial crimes in November and has been sentenced to prison. Whether any restrictions exist on his activity while awaiting the appeals process, is not clear as Defendants did not so much as notify Plaintiff that this had occurred. Jozinović informed Plaintiff on March 13, 2026, that his current activity continues to be authorized by ZGW's board, Allen, Senator Santorum and Jeff Blackard, including pressuring Plaintiff to sign a form that would make it responsible for their Novi Marof site. ZGW's Jozinovic stated on March 13, 2026: "Everybody wants to make money. We don't want to trick anybody. So, consider me as a new angle. I'm not doing anything parallel. I asked my board for an approval Jeff and the guys gave it to me."

ZGW's Jozinovic explained on March 13, 2026: "My machine cannot work. If I, you know, it's a high voltage. Somebody goes…you know blue collar labor. Somebody will ask me for CE marks. You understand from practical reasons. I need that." Plaintiff respectfully maintains that there can be no room remaining for patience. ZGW's own head of operations specifically referenced safety concerns and potentially referenced the potential for harm or death to labor personnel and the

potential for CE investigations thereafter. CE marking enforcement in Europe, particularly extraordinary remedies such as market bans or criminal investigations, are often most prominently triggered or intensified when personnel (e.g., consumers or laborers) suffer injuries or deaths due to non-compliant products. This warning from Jozinovic, was then followed by him acknowledging that the entire set up should be CE marked, but then declining, instead attempting to induce Plaintiff to take on responsibility. Jozinovic, referencing CE compliance, stated: "So i can do it on the site. there is a way how to do it differently. it gives me more troubles. i spend more money. i don't need that. you just forward this responsibility to me. i will take care of everything else." Jozinovic was referencing a form that would have transferred liability to Plaintiff's parent company and/or the personal signatory that he had emailed to Plaintiff - a document that appoints Zero Global Waste Croatia as a mere representative on behalf of the parent of Plaintiff, who would take on responsibility. The signature line was pre-populated prompting the CEO of Ecogensus, Bjørnulf Østvik, personally, as signatory. Analysis of the meta data confirmed the author of this document was "Ivan". Approximately two weeks ago, "Ivan Tilosanec" of Zagreb, Croatia was viewing Bjørnulf Østvik's personal LinkedIn page. Ivan Tilosanec is also the author of the letter in 2022 sent to Bjørnulf Østvik and others threatening criminal proceedings over CE markings for ZGW's 2019-2020 operation. These years of harassment must end. ZGW has had years to choose a pathway of proper regulatory compliance and simply chooses instead to use intimidation tactics and deceit, while, as Plaintiff has recently learned, operating a high-voltage equipment set up susceptible to transformers blowing, directly adjacent to the Plinacro Ltd.'s high-pressure gas line and Podrute measuring reduction station. The contractual remedy that ZGW agreed to, return of the equipment, must now be enforced.

### D.    *Years of Exclusion*

21.     Between 2020 and 2022, despite successful commissioning and operation at the host facility, ZGW denied Plaintiff the operating data and visitation access that were a material inducement of the original arrangement. Plaintiff was denied the opportunity to observe its own technology in operation. Plaintiff was denied the data it needed for continued development. Plaintiff was denied the reputational benefit it was promised. On information and belief, ZGW also burdened the host facility operator well beyond the scope of what was reasonable, and that relationship ended in litigation.

22.     In early 2022, ZGW relocated the Existing Equipment to a new location in Podrute, near Novi Marof, Croatia. For four years, Plaintiff's components have sat at this location. ZGW has not operated the equipment commercially. ZGW has not obtained a waste processing permit. ZGW has not applied CE marking. ZGW has not provided Plaintiff with any information regarding the status, condition, or configuration of the equipment. And throughout this period, ZGW's board, Allen, Santorum, and Blackard, has continued to fund and authorize the Croatian operation under the direction of Jozinović, a convicted individual, while Plaintiff's technology sits in regulatory limbo, trapped in an industrial hall next to a high pressure gas line, and now provably susceptible to observation by unauthorized third parties.

### E.     Croatian Organization Outreach

23.     In recent weeks, a Croatian environmental organization, Eko udruga "Naš zavičaj," reached out to Plaintiff to provide a detailed report on the Podrute Facility together with photographs taken from inside the facility. SRF learned of the conditions of the facility from this third party, not from ZGW, which was contractually obligated to safeguard the equipment. Plaintiff has never had any contact with this organization and this communication was sent because they located Plaintiff's 2022 request for emergency relief against ZGW (related then to concerns around

intellectual property protection, of the same exact components and process, that are the subject of this filing).

24.    The photographs depict what appears to be EGS-5000L module component shells and related equipment inside an industrial building. It is not possible to tell what is inside the cabinet module shell. Certain photographs show what appears to be a standalone module. Other photographs show a multi-module configuration connected with ventilation ducting, power supply lines, and supporting infrastructure. Whether these images depict the same equipment at different stages over a long period of time, different equipment configurations, or components that Plaintiff did not supply, is not known to Plaintiff. What is known is that individuals accessed the facility, documented the equipment at close range, including what is described as a detailed view of certain close up views, and then transmitted these images to third parties, who in turn provided them to Plaintiff.

25.    In November 2025, Mladen Jozinović, the director of ZGW Croatia, personally walked a journalist from Varaždinski.hr through the Podrute Facility. He showed the journalist the installed equipment but asked that it not be photographed, stating, remarkably, that it was "a protected patent."

### F.    The Pyrolysis Misrepresentation

26.    In July 2022, in an official public statement to the Croatian national broadcaster HRT, ZGW Croatia described its planned operations at the Podrute Facility as "vacuum pyrolysis" at "a maximum temperature of 240 degrees Celsius." In November 2025, the technical documentation for the installed equipment then referenced a process temperature of 200°C, while ZGW Croatia continued to describe the operation as vacuum pyrolysis to Croatian media.

27.     Plaintiff's technology is not pyrolysis. The DOR process and pyrolysis are fundamentally different in mechanism, chemistry, and operating conditions. Plaintiff's process components are designed for specific low temperature materials manufacturing ranges and specific process conditions associated with the DOR process. Plaintiff did not design, authorize, or approve the use of its components in any pyrolysis process.

28.     If ZGW has integrated Plaintiff's components into an installation performing pyrolysis, or any process other than the DOR process for which the components were designed, Plaintiff has grave concerns. Components designed for one process and one set of operating parameters may be unsafe if operated under different conditions, at different temperatures, or with heat sources or configurations for which they were not designed. Plaintiff does not know what heat sources ZGW has connected, what modifications ZGW has made, or what process is actually running at the Podrute Facility.

### G.     The Director of ZGW Croatia

29.     Croatian media have extensively reported that Jozinović has been convicted in criminal proceedings relating to his prior role as director of a public waste-management company, involving financial malfeasance in waste-management operations. He was sentenced to 2.5 years of imprisonment. The judgment is subject to appeal. Jozinović is the individual to whom ZGW's board has entrusted day-to-day control over Plaintiff's proprietary technology, and the individual who told Croatian national media that he runs pyrolysis at 240°C using what he claimed to a journalist was "a protected patent." ZGW's board has not removed Jozinović from his position despite his conviction.

### H.     Bostic's False Representations

30.     ZGW has been represented in the pending AAA mediation and in prior dealings with SRF by Austin Champion of Champion LLP, Dallas, Texas. Champion filed the Request for Mediation with the American Arbitration Association on October 27, 2025 on ZGW's behalf. In correspondence during this period, Champion stated: "I am the only attorney representing ZGW and have been for some time." Bostic is not ZGW's counsel of record.

31.     Separately, in or around January 2026, Bostic was introduced to Plaintiff's representatives through Champion. Will Allen of Providence Energy separately explained that Santorum had asked Bostic to get involved and see if he could resolve the dispute. On information and belief, Bostic's involvement was requested by Senator Santorum to pursue an alternative approach. Bostic identified himself as a shareholder who spoke for the broader interests of ZGW's investors and partners. Since his introduction, Bostic has engaged exclusively in business and commercial discussions. The mediation statements have not been exchanged yet, and no mediation session has occurred.

32.     The context of Bostic's statements is critical. SRF's technology process was successfully operated and the proprietary components supplied were even stress-tested to extreme unauthorized conditions by ZGW in 2020 at the first host facility, with results independently evaluated and verified. ZGW issued internal glowing reports to its partners and investors regarding the technology's performance, though Plaintiff only discovered those in an audit two years later. On the strength of that performance, ZGW's CEO projected in December 2020 that ZGW could purchase up to 5,000 more system sets within five years. Between 2021 and 2022, ZGW sought to expand its territorial rights and placed additional orders. In February 2023, ZGW executed the Fourth amendment to the original equipment supply and license agreement, which committed ZGW to complete the additional equipment orders it had already placed, required an escrow wire

within approximately 60 days, and included ZGW's commitment to order 60 additional equipment sets within 36 months. This is not the conduct of a company that doubts the technology. It is the conduct of a company that knew the technology worked and wanted more of it.

33.    It is against this backdrop that Bostic, whose stated purpose was to expand ZGW's rights or acquire Ecogensus outright, raised supposed alarm about the existence of two European lawsuits in which purchasers allegedly claimed the machines "failed to function."

34.    On February 25, 2026, Bostic sent a text message to an SRF representative stating that ZGW had "learned of two suits in Europe," that both suits were "in our exclusive territory where machines were sold," and that "apparently in both of these suits, the purchasers allege the machines failed to function." Bostic asked the recipient to explain "why machines were provided in regions in which ZGW paid to have exclusivity." Bostic sent this message at a time when he knew the recipient was on an airplane, traveling on an emergency basis to attend to an immediate family member in hospice care and was unable to respond substantively. The recipient responded: "I'm on a plane now. I have no background on anything in your text." Days earlier, Bostic stated that he was personally aware of "the same machine" as Plaintiff's technology somewhere in Europe, running "pretty much the same process", indicating the claim was premeditated. Bostic's comment then was a retort to the proprietary value of Plaintiff and Ecogensus' in a business discussion about a strategic transaction. Thus, his comment was intended to suggest awareness of a substantially similar process to somehow undermine the value of Plaintiff's intellectual property, which would be remarkable given the issued European process patent that protects DOR, and thus necessarily intended this to refer to machinery and a process that is not Plaintiff's.

35.    One version of Bostic's representations must be false. Neither SRF nor Ecogensus has any European customers, has never sold a complete integrated system to any European

purchaser, has never delivered equipment components to any party in Europe other than those that are in ZGW's possession. Any variation of what Bostic meant when he suggested Plaintiff's "machines were sold" could not be true. There are no "purchasers" who could have legitimately filed suit. Plaintiff checked, however, if any party mistakenly had named it, and found no reference to its name or any affiliate name anywhere in any European judicial system. However, since proceedings may take time to be docketed or may be sealed, Plaintiff continues to investigate. Bostic, for his part, provided no case numbers, no party names, no jurisdiction, and no documentation. He made no follow-up regarding these purported lawsuits.

36.     Bostic cannot have it both ways. He cannot simultaneously know that SRF's technology works, as demonstrated by ZGW's own operational history, its orders, its territorial expansion, its commitments under the Fourth MLA, and the very acquisition that Bostic himself was pursuing, and at the same time express genuine concern about machines that he believes to be Plaintiff's that "failed to function." If Bostic is aware the technology works, his statement was knowingly false. If Bostic believed the technology did not work, his entire purpose in entering the dispute, to expand ZGW's rights or acquire Ecogensus, was itself a fraud on ZGW's own investors. The former is the only plausible reading. If the lawsuits do not actually reference Plaintiff, then he has knowingly made a false accusation to Plaintiff about alleged exclusivity provisions. If they do reference Plaintiff, he has obligations under the equipment supply and license agreement to cooperate with Plaintiff to help it protect its intellectual property. If his use of "apparently" was superfluous, and he believed the content of his message to be true, then he must assist Plaintiff in investigating potential intellectual property breaches, pursuant to ZGW's contractual obligations, a failure which itself raises serious questions about true intent. If his use of "apparently" was intended as a qualifier, that was deliberately meant to distance himself from the truth of these

statements, then he has revealed his consciousness of guilt in making false representations to manufacture a bad faith allegation of Plaintiff. There is simply no explanation that does not end up with serious problems for Bostic.

37.    Whatever the explanation, Bostic's representations were clearly designed to create false urgency and pressure SRF into a negotiated resolution on terms favorable to ZGW, at a moment of maximum personal vulnerability for SRF's representative.

38.    In the same exchange, Bostic stated that his view was "increasingly that the company needs a receiver." Bostic does not have any financial or operational information about Plaintiff or its parent, assuming one of these was the 'company' he was referencing. This was clearly a threat by a shareholder of ZGW foreshadowing intent to seek an extraordinary corporate governance remedy against Ecogensus, a company in which Bostic has no ownership interest. The threat was made before any mediation proposals had been exchanged and functioned as coercion: resolve on ZGW's terms or face an attempt to wrest control of the company.

40.    Bostic's interference with the mediation process and Plaintiff's operations have occurred throughout the last several weeks, with Bostic repeatedly attempting to prematurely declare a contractually required mediation that ZGW itself asked for (facing termination for nonperformance), to somehow be at an impasse before any proposals have even been exchanged. On February 25, Bostic asked SRF's representative to "agree that in reality we are at an impasse" and characterized the mediation as "a process that probably cannot provide a solution." In fact, the solution Bostic referred to was the same one he requested in New York, a proposal he wanted Plaintiff and its parent to make, to sell itself at some dramatically discounted price or, even worse, to enter into a no money down arrangement by which ZGW could practice the technology, including manufacturing components directly outside of Plaintiff's involvement, with the promise

of some sort of back-end royalty. Plaintiff has repeatedly declined the demand to provide a proposal to 'sell itself' or give away rights to its IP essentially for free. Plaintiff repeatedly stated that a mediation cannot be at an impasse before a mediation has occurred. Bostic's repeated attempts to terminate the mediation before it began constitute bad-faith conduct that serves his interests as a shareholder seeking a different outcome, not the interests of good-faith dispute resolution.

### I.    The Latest Attempt to Shift Regulatory Liability

41.    In or around March 2026, agents of ZGW acting with the express authorization of ZGW's board of directors contacted SRF's representatives and requested that SRF execute a "power of representation" designating Plaintiff's parent company as the "manufacturer" of the integrated installation at the Podrute Facility for purposes of EU regulatory compliance. This is at least the third iteration of the same bad faith strategy. ZGW failed to obtain CE compliance in the first place. If ZGW's attorney was correct that they needed to have CE markings at their Varazdin operation, then Senator Santorum's claim of an R&D exemption was incorrect. Regardless, they certainly would have needed one at their Novi Marof site, acquired in 2021. Rather than comply, in 2022, ZGW threatened criminal proceedings over a prior facility. In early 2023, ZGW agreed in writing that the obligation was ZGW's and that failure to comply would require return of the equipment. Now, in 2026, having failed to comply for over three years, ZGW is attempting to achieve through a back-door document what it could not achieve through threats: the transfer of its regulatory obligations to Plaintiff.

42.    Execution of the requested document would expose Plaintiff to regulatory liability for an installation Plaintiff did not assemble, in a facility Plaintiff does not control, running a process Plaintiff did not authorize, under the supervision of a head of operations / director who has

been convicted of financial crimes, all while ZGW's board, including a former United States Senator, continues to direct operations. Plaintiff does not know what has been built. Plaintiff does not know what process is running. Plaintiff does not know what modifications have been made. And Defendants want Plaintiff to accept manufacturer liability for all of it. Plaintiff has not executed the document and will not do so. Moreover, this same head of operations has warned that their operation is high-voltage and warned that there may be future harm to labor personnel, and that CE markings would then be sought by regulators inspecting.

### J.      The Mutual Release and ZGW's Warranty

43.     Section 4.06 of the Mutual Release provides: "Warranty of No Infringement: In executing this Release, ZGW and SRF represent and warrant that neither is aware of infringements of or related to any Intellectual Property owned by SRF as referenced and defined in the Fourth MLA."

44.     At the time ZGW executed the Mutual Release on February 2, 2023, ZGW had secretly filed applications with the United States Patent and Trademark Office in April 2022 to register two marks that cover the technology process and product. ZGW's own specimens identify the underlying process as invented by Ecogensus's founder, as "utilized in Ecogensus systems," and as "a globally patented process." ZGW did not disclose this pending application to SRF.

45.     Plaintiff reserves all rights arising from the circumstances surrounding ZGW's representation in Section 4.06, including claims relating to the validity, enforceability, and scope of the Mutual Release.

### K.      Pattern of Conduct

46.     The breaches described herein have not occurred in isolation. They are the product of years of non-compliance, misrepresentation, and bad faith by a licensee whose board, Michael

Allen of Providence Energy, former United States Senator Rick Santorum, and CEO Jeffory Blackard, has at every stage endorsed, funded, and authorized the conduct of the Croatian operation, including the continued engagement of Jozinović as a senior executive despite his criminal conviction. On information and belief, this pattern reflects a coordinated effort to pressure SRF and Ecogensus into a below-market disposition of the technology.

47.    In or around spring 2025, parties associated with ZGW proposed acquiring Ecogensus at a valuation dramatically below its most recent capital formation. That proposal was rejected. The conduct alleged herein escalated following the rejection.

48.    Croatian legal representatives associated with ZGW have directed threatening communications to SRF personnel, including threats of criminal prosecution in Croatia for testimony given in connection with legitimate security concerns.

49.    ZGW itself manufactured the entire circumstances of the mediation they called for, when only a little over 3 months remained left of their 36 month performance timeline to order 60 system equipment sets, but they still had ordered zero. ZGW had placed a pre-order notice for 1 single system set, and the Plaintiff and ZGW had engaged in certain technical discussions. Technical agreement on specifications was achieved on or around October 3, 2025. ZGW also claimed they planned to begin operating Plaintiff's equipment in Croatia and enlisted Plaintiff's technical support. Plaintiff wrote to ZGW on October 13, 2025 that it must comply with Section 2.02 of the Existing Equipment Agreement. Plaintiff even went on to explain that it understood their Novi Marof site to involve "new integration work - electrical, vacuum, and building-level integrations and systems - that changes the overall configuration. Under EU rules, this constitutes a new system and therefore requires its own conformity assessment and CE-marking before it can be legally commissioned, regardless of any earlier or pending CE activities." Plaintiff wrote "SRF

cannot lawfully provide technical support for recommissioning or operation until the CE-marking process is complete and all required certifications are in place. Providing services on non-compliant machinery could expose all parties, including any associated contractors or participants, to regulatory and professional-liability risk." Plaintiff provided a deadline of October 17, 2025 for ZGW to provide the required documentation. It never did. Instead, on October 27, 2025, ZGW filed a Request for Mediation through Champion LLP alleging SRF had breached the Fourth MLA by "refusing to approve Purchase Order Notices, refusing to provide Notice Period Deliverables, and by refusing to accept Purchase Orders." ZGW had never submitted a Purchase Order. The mediation demand is consistent with a tactical effort to avoid its obligations. There can be no more chances. There are serious safety considerations and Plaintiff fears the location on a high-pressure gas line creates extraordinary risks. As ZGW's own head of operations foreshadowed: "you know it's a high voltage. somebody goes…you know blue collar labor. somebody will ask me for CE marks you understand. from practical reasons. i need that." Plaintiff asks that the agreed-upon contractual remedy be enforced as soon as possible.

50.    Plaintiff filed this action promptly upon learning the full scope of the conditions at the Podrute Facility. The critical facts alleged herein were discovered by Plaintiff within the last few weeks: the interior photographs from Eko udruga arrived in January 2026; Jozinović's conviction was reported in November 2025 in Croatian-language media but was not known to Plaintiff until this year; the Bostic fabrications occurred in February 2026; the POA scheme, including the March 6 and March 11 emails and the March 13 telephone call, occurred in March 2026; the proximity of the facility to the high-pressure gas line was discovered in the last two weeks while further gas line activation was reported in the European media last week; and Will Allen's disclosures about dry runs and transformer failures were made in recent weeks. Plaintiff's

prior inability to discover these facts is itself a consequence of Defendants' systematic exclusion of

Plaintiff from any visibility into the facility or the status of the equipment.

## CLAIMS FOR RELIEF

## COUNT I

### Breach of Existing Equipment Agreement § 2.04

*(Failure to Preserve Secrecy and Prevent Third-Party Access)*

*(Against ZGW and ZGW Croatia)*

50.    Plaintiff incorporates by reference all preceding paragraphs.

51.    Section 2.04 imposed on ZGW an affirmative obligation to utilize commercially reasonable measures to preserve the secrecy of the Existing Equipment and to prevent unauthorized third-party access. ZGW was further required to immediately pursue remedies against any third party that breached these protections.

52.    Unauthorized individuals accessed the Podrute Facility and photographed Plaintiff's proprietary technology, including equipment configurations and equipment internals. SRF learned of this from a Croatian environmental organization. On information and belief, ZGW has taken no action to secure the site or pursue remedies.

53.    As a direct and proximate result, Plaintiff's proprietary technology and Confidential Information have been exposed to unauthorized third parties, causing irreparable harm.

## COUNT II

### Breach of Existing Equipment Agreement § 2.02

*(Failure to Obtain CE Marking and Triggering of Return Obligation)*

*(Against ZGW and ZGW Croatia)*

54.    Plaintiff incorporates by reference all preceding paragraphs.

55.    Section 2.02 assigned to ZGW responsibility for all expenses relating to the Existing Equipment, including CE marking. Despite years of custody, and despite having weaponized this issue in 2022, agreed in writing to comply in 2023, and then failed to comply for more than three years, ZGW has never obtained CE marking. Not at the first host facility. Not at the Podrute Facility. ZGW is the manufacturer of the final integrated installation under applicable EU law and bears sole regulatory responsibility.

56.    ZGW's continued failure to obtain CE marking, combined with its ongoing attempt to transfer manufacturer liability to Plaintiff through the "power of representation" described herein, demonstrates that ZGW cannot and will not comply with its regulatory obligations. On March 13, 2026, ZGW's own head of Croatian operations confirmed that the equipment lacks CE marking, acknowledging that the equipment cannot operate, and warning that in the event of harm to personnel at the facility, regulators would investigate CE compliance. The return provision of Section 2.07 exists for precisely this circumstance. Plaintiff is entitled to enforcement of the remedy ZGW agreed to.

57.    As a direct and proximate result, the Existing Equipment exists in a state of regulatory non-compliance, creating ongoing regulatory, legal, and reputational harm to Plaintiff's technology.

**COUNT III**

**Breach of Fourth MLA Article VI § 6.01**

*(Failure to Maintain Security Safeguards)*

*(Against ZGW)*

58.    Plaintiff incorporates by reference all preceding paragraphs.

59.     Section 6.01 required ZGW to implement reasonable physical security safeguards to prevent unauthorized access to Confidential Information. Photographs of equipment configurations and internals constitute Confidential Information. The fact that these were taken by unauthorized individuals and transmitted outside the facility demonstrates wholesale failure.

60.     As a direct and proximate result, Plaintiff's Confidential Information has been disclosed to unauthorized individuals and is no longer within Plaintiff's control.

## COUNT IV

### Misappropriation of Trade Secrets

*(Defend Trade Secrets Act, 18 U.S.C. §1836)*

*(Against ZGW and ZGW Croatia)*

61.     Plaintiff incorporates by reference all preceding paragraphs.

62.     Plaintiff's DOR process technology, equipment configurations, process parameters, proprietary component designs, internal vessel construction and geometry, operational protocols including temperature profiles and run-time sequences, and the accumulated operational know-how required to effectuate the DOR process, constitute trade secrets within the meaning of 18 U.S.C. §1839(3). This information derives independent economic value from not being generally known to, or readily ascertainable through proper means by, persons who could obtain economic value from its disclosure or use. Plaintiff took reasonable measures to keep this information secret, including the confidentiality provisions of the Fourth MLA Article VI, the physical security requirements of Section 6.01, and the secrecy and access-prevention obligations of Section 2.04 of the Existing Equipment Agreement.

63.    Defendants misappropriated these trade secrets by permitting unauthorized third parties, including journalists and members of environmental organizations, to access, observe, photograph, and disseminate images and detailed information regarding the proprietary technology at the Podrute Facility, including equipment internals and equipment configuration details, without Plaintiff's knowledge or consent. These disclosures were made by parties who owed contractual duties of confidentiality and who had authorized possession of the trade secrets but no authorization to disclose them. The disclosed information includes operational know-how that goes beyond what is described in Plaintiff's published patents. The patents protect the process principles; the trade secrets encompass the accumulated practical knowledge required to implement the process, including internal component geometry, vessel construction, and operational parameters that are not publicly available and that could not be reverse-engineered from the patents alone.

64.    These trade secrets are used in, and the products and services produced therefrom are intended for use in, interstate and foreign commerce within the meaning of 18 U.S.C. §1836(b)(1). The proprietary components and process were developed in the United States and shipped to Croatia pursuant to international licensing agreements.

65.    As a direct and proximate result, Plaintiff has suffered actual loss and Defendants have been unjustly enriched. Defendants' misappropriation was willful and malicious, entitling Plaintiff to enhanced damages and attorney's fees under 18 U.S.C. §1836(b)(3).

## COUNT V

### Breach of Fourth MLA § 5.02(e)

*(Material Term, Undermining Licensor's Intellectual Property)*

*(Against ZGW and Bostic)*

61.    Plaintiff incorporates by reference all preceding paragraphs.

62.    Section 5.02(e) provides that Licensee "shall, under no circumstances, aide, assist in, cause to be, direct, or otherwise participate in any action taken by any third party which alleges infringement, misappropriation, or other violation by Licensor with regard to Licensor's Intellectual Property." The Fourth MLA designates this as "a material term."

63.    ZGW breached Section 5.02(e) through the conduct of Bostic, who acted as ZGW's authorized shareholder, representative, and agent. Bostic was introduced by ZGW's own counsel, authorized by ZGW's board, and identified himself as speaking for ZGW's investor group. His conduct is attributable to ZGW. Bostic is independently liable for his participation in the breach as a shareholder within the Existing Equipment Agreement's definition of "ZGW" and as the individual who personally committed the acts. Throughout this dispute, Defendants have repeatedly utilized various agents, representatives, and shareholders to advance their interests while seeking to insulate the individuals involved from accountability. The Existing Equipment Agreement's definition of "ZGW," which expressly includes shareholders, representatives, and agents, ensures that those who act on behalf of the enterprise bear the same obligations as the enterprise itself. Bostic is precisely the type of participant this definition contemplates: a co-owner who voluntarily assumed a strategic role, traveled to New York to pursue that role, and committed the acts alleged herein in direct furtherance of ZGW's objectives.

64.    Bostic's conduct breached Section 5.02(e) in two independent respects. First, Bostic claimed to be personally aware of "someone with pretty much the same exact machine doing the same thing somewhere." SRF's technology is the subject of a global patent portfolio. If Bostic's claim is true, it constitutes knowledge of potential infringement of  the licensor's intellectual property. Rather than reporting this knowledge and cooperating with Plaintiff to protect

the intellectual property as required by the license, Bostic weaponized it as a threat designed to depress Plaintiff's bargaining position. That is the opposite of the cooperation Section 5.02(e) demands. Moreover, the term "action" in Section 5.02(e) is not limited to formal lawsuits. It encompasses any act by a third party that alleges violation of the licensor's intellectual property. Bostic's own fabrications, his origination and communication of false claims that the technology failed and that a copycat machine exists, are themselves "actions" that allege "other violation... with regard to Licensor's Intellectual Property." If Bostic's claim is false, it is a fabrication designed to create the impression that Plaintiff's patented technology has been replicated, thereby undermining the value and exclusivity of the intellectual property.

65.    Second, Bostic fabricated the existence of two European lawsuits alleging that Plaintiff's technology "failed to function." On information and belief, no such lawsuits exist. Neither SRF nor Ecogensus has European customers or has delivered equipment to any party in Europe other than ZGW. There are no "purchasers" who could have filed suit. Bostic provided no documentation and made no follow-up. The fabrication of product-failure litigation against a patented technology is itself an action that "alleges... violation by Licensor with regard to Licensor's Intellectual Property" within the meaning of Section 5.02(e). ZGW's own operational history, including successful testing, glowing partner reports, additional orders, territorial expansion, and a commitment to 60 additional systems under the Fourth MLA, demonstrates that ZGW knew the technology functioned as designed. A shareholder who fabricates claims that the technology "failed to function," when his own company's experience proves the opposite, is participating in undermining the Licensor's intellectual property position. As set forth above, Bostic cannot simultaneously pursue acquisition of this technology and fabricate claims that it failed to function. The fabrication itself is the prohibited action. Creating the false impression that

third-party intellectual property -related proceedings exist constitutes participation in an action alleging violation of the intellectual property. A party cannot fabricate allegations against patented technology and then argue that the fabrication was not real and therefore the clause does not apply.

66.     As a direct and proximate result, Plaintiff has suffered harm to its intellectual property position, commercial reputation, and negotiating posture, and has incurred legal fees and expenses investigating the fabricated claims, investigating the purported competing technology, and preparing enforcement actions necessitated by the breach.

## COUNT VI

### Fraudulent Misrepresentation

*(Against Bostic Individually)*

67.     Plaintiff incorporates by reference all preceding paragraphs.

68.     On February 25, 2026, Bostic stated to an SRF representative that ZGW had "learned of two suits in Europe" in ZGW's exclusive territory where "machines were sold" and that "the purchasers allege the machines failed to function." Bostic's use of qualifying language such as "learned" and "apparently" does not insulate the statement. Bostic asserted as fact the existence of two lawsuits by identifiable purchasers in a specific territory. This was a false statement of material fact. No such lawsuits exist. Neither SRF nor Ecogensus has any European customers, has ever sold a complete integrated system to any European purchaser, or has ever delivered equipment to any party in Europe other than ZGW. There are no "purchasers" who could have filed suit. Bostic provided no case numbers, no party names, no jurisdiction, and no documentation, and made no follow-up regarding these purported lawsuits.

69.     Bostic knew his statement was false. ZGW's own operational history demonstrates that ZGW and its shareholders knew the technology functioned as designed: the technology was

successfully operated and independently evaluated in 2020; ZGW issued positive reports to its partners and investors; ZGW's CEO projected the purchase of up to 5,000 systems; ZGW sought to expand its territorial rights in 2021 and 2022 and placed additional orders; and in the Fourth MLA, ZGW committed to complete those orders, funded an escrow within approximately 60 days, and committed to ordering 60 additional systems within 36 months. Bostic had direct access to this history. He had been briefed on the license terms and territory by ZGW's board. He had personally requested and traveled to New York City to pursue a potential acquisition of Ecogensus' technology. He had been engaged in detailed commercial discussions regarding the scope of ZGW's license, the valuation of the technology, and the terms of a potential transaction. He had direct access to ZGW's board, including CEO Jeffory Blackard, and was in regular communication with ZGW's investors. A shareholder who is actively pursuing the acquisition of a technology company does not genuinely believe that the technology "failed to function." Bostic cannot have it both ways: he cannot simultaneously seek to expand ZGW's rights and acquire Plaintiff and its parent, Ecogensus, while claiming genuine concern about nonfunctional machines that do not and cannot exist. If Bostic had no basis for his statement, then he asserted the existence of specific legal proceedings with reckless disregard for truth or falsity, which independently satisfies the scienter requirement for fraud under New York law. A person who asserts specific facts, the existence of two lawsuits, identifiable purchasers, a specific territory, without any basis for knowing whether those facts are true, acts recklessly. The qualifier "apparently" makes this worse, not better: it reveals Bostic's consciousness that he was operating without verified information, yet he made the assertion anyway. If he did not know whether the lawsuits existed, he should not have stated that they did.

70.     The fabrication was premeditated. Bostic raised the subject of purported European lawsuits in communications days before the February 25 text. He sent the false statement at a time when he knew the recipient was traveling on an emergency basis to attend to an immediate family member in hospice care, maximizing pressure at a moment of personal vulnerability. His failure to provide any documentation or follow-up is itself evidence that there was nothing to document.

71.     Bostic's false statement caused SRF to take concrete action in response. Upon learning of the fabricated lawsuits, SRF undertook efforts to assess the veracity of the claimed proceedings. The existence of foreign legal proceedings across multiple European jurisdictions is not a readily verifiable fact. Court systems in the relevant territories operate under different languages, different procedural rules, and varying levels of public accessibility; some proceedings may be sealed, undocketed, or maintained in closed systems. SRF investigated whether any third party had obtained or was using its patented technology without authorization. SRF diverted counsel and resources from planned enforcement actions, including the preparation of contractual termination notices and the filing of this action. SRF was forced to assess whether Bostic's statement was a veiled threat that he or ZGW would spread misinformation publicly to devalue SRF's technology and weaken its commercial position. These were not speculative concerns; they were the direct organizational consequences of a false statement injected into an active, high-stakes dispute by a shareholder with the means and motive to cause reputational and commercial harm.

72.     As a direct and proximate result, Plaintiff has suffered damages including legal fees and expenses incurred in investigating the fabricated lawsuits and purported competing technology, delay in executing planned enforcement actions, disruption of ongoing litigation preparation, harm to its negotiating position, and the effective sabotage of the contractually required mediation process. Bostic's fabrication, combined with his simultaneous demand that the

mediation be declared at an impasse and his threat of receivership, rendered the mediation unworkable. Plaintiff was denied the benefit of the contractual dispute resolution mechanism and was instead forced to file this action, incurring the costs and delays of federal litigation that the mediation process was designed to avoid. Bostic's false statement was a component of a broader pattern of shareholder pressure tactics designed to coerce a below-market acquisition of technology that, by Defendant's own analysis, represents billions of dollars in equipment sales and royalty value in ZGW's territory alone. Bostic's conduct was willful and malicious, entitling Plaintiff to punitive damages.

## COUNT VII

### Injunctive Relief Against Bad Faith Attempt to Shift Regulatory Liability

*(Against ZGW and ZGW Croatia)*

73.    Plaintiff incorporates by reference all preceding paragraphs.

74.    Section 2.02 of the Existing Equipment Agreement assigns CE marking responsibility to ZGW. EU Machinery Directive 2006/42/EC, and the later applicable regulation, independently assigns it to ZGW as the integrator. ZGW weaponized this obligation through criminal threats in 2022, agreed in writing to comply in 2023, failed to comply for more than three years, and is now, through agents acting with board authorization, seeking to induce Plaintiff to execute a document that would retroactively transfer these obligations to Plaintiff. This is the third iteration of the same bad faith strategy, and each iteration has escalated: from threats, to broken promises, to active deception. The requested document was pre-populated with the name and title of the CEO of Plaintiff's parent company as signatory. As set forth above, analysis of the document's metadata confirmed its author was the same individual who sent the 2022 threatening

correspondence regarding CE compliance, and who was recently observed viewing the personal LinkedIn profile of Plaintiff's parent company's CEO.

75.     This conduct constitutes bad faith, is inconsistent with ZGW's express obligations, and threatens immediate and irreparable regulatory and legal harm to Plaintiff. Plaintiff seeks a permanent injunction prohibiting Defendants from representing Plaintiff as the manufacturer of the integrated installation, from submitting any regulatory filing identifying Plaintiff as manufacturer, and from soliciting Plaintiff's execution of any document that would transfer regulatory obligations to Plaintiff.

## COUNT VIII

### Injunctive Relief: Unauthorized Process and Safety Concerns

*(Against ZGW and ZGW Croatia)*

76.     Plaintiff incorporates by reference all preceding paragraphs.

77.     ZGW Croatia has publicly represented to Croatian national media that the Podrute Facility operates "vacuum pyrolysis" at temperatures up to 240°C. Plaintiff's technology is not pyrolysis. Plaintiff's components are designed for the DOR process, which operates under fundamentally different conditions. Plaintiff did not design, authorize, or approve the use of its components in any pyrolysis process.

78.     Plaintiff does not know what installation exists at the Podrute Facility. Plaintiff does not know what modifications have been made to its components. Plaintiff does not know what heat sources have been connected or what process is running. The Podrute Facility is situated directly adjacent to a high-pressure gas line operated by Plinacro Ltd. ZGW's own head of Croatian operations has acknowledged transformer failures at the facility and warned of safety risks to personnel from operating high-voltage equipment without CE compliance. If Plaintiff's

components have been integrated into an installation performing pyrolysis or any unauthorized process, that use is potentially dangerous, constitutes a misrepresentation of Plaintiff's technology to the public, and causes ongoing reputational harm to Plaintiff by associating its proprietary technology with a process it did not develop and does not endorse.

79.    Plaintiff seeks an order requiring immediate inspection access to determine the condition and configuration of its components; an order requiring Defendants to cease operating Plaintiff's components in any unauthorized process; and an order requiring the return of Plaintiff's components if they are being used outside their design parameters or in connection with any process other than the DOR process.

## COUNT IX

### Declaratory Judgment

*(Against All Defendants)*

80.    Plaintiff incorporates by reference all preceding paragraphs.

81.    An actual controversy exists. Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring:

(a)    ZGW has materially breached its custody and security obligations under Section 2.04 of the Existing Equipment Agreement;

(b)    ZGW has materially breached its CE marking obligations under Section 2.02;

(c)    SRF is entitled to immediate inspection access to the Podrute Facility to assess the condition, configuration, and integrity of its components;

(d)    ZGW's obligations under Section 2.07 to cause the Existing Equipment to be safely disassembled and conveyed to the United States at ZGW's sole cost and expense have been triggered by ZGW's failure to comply with its regulatory obligations and

its de facto cessation of the business operations contemplated by the Fourth MLA, or will be triggered upon formal termination of the Fourth MLA, and SRF is entitled to enforce this contractually agreed remedy;

(e)     SRF retains all intellectual property rights in its components, their configurations, and all Confidential Information, and no third party has acquired any rights therein;

(f)     The representations and warranties made by ZGW in Section 4.06 of the Mutual Release are material to the enforceability of the Mutual Release and to Plaintiff's rights thereunder;

(g)     ZGW is and has at all times been the manufacturer of the integrated installation at the Podrute Facility for purposes of EU regulatory compliance, and SRF bears no regulatory obligation for the installation;

(h)     ZGW is prohibited from operating Plaintiff's components in any process other than the DOR process for which they were designed, and is required to return the components if it cannot or will not operate them in compliance with their design parameters and the operative agreements;

(i)     Bostic, as a shareholder of ZGW, falls within the definition of "ZGW" in the Existing Equipment Agreement and is bound by its forum selection and substantive provisions, including the obligations set forth therein.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendants, and award the following relief:

1. A permanent injunction requiring Defendants to secure the Podrute Facility against unauthorized access and comply with their custodial obligations;

2. A permanent injunction requiring Defendants to complete CE marking or cease all use and preparation for operation of the Existing Equipment;

3. An order directing Defendants to cause the Existing Equipment to be safely disassembled and conveyed to the United States into the custody of Plaintiff at Defendants' sole cost and expense, as Defendants agreed to do under Section 2.07 of the Existing Equipment Agreement in the event of non-compliance, a condition that has now persisted for more than three years;

4. An order granting Plaintiff immediate inspection access to the Podrute Facility to determine the condition, configuration, and operational status of its components;

5. A permanent injunction prohibiting Defendants from representing Plaintiff as the manufacturer of the integrated installation, from submitting any regulatory filing identifying Plaintiff as manufacturer, and from soliciting Plaintiff's execution of any document transferring regulatory obligations to Plaintiff;

6. A permanent injunction requiring Defendants to cease operating Plaintiff's components in any pyrolysis process or any process other than the DOR process for which they were designed, and to return the components to Plaintiff if Defendants cannot or will not operate them within their design parameters;

7. An order requiring Defendants to cease publicly describing Plaintiff's technology as "pyrolysis" or associating Plaintiff's technology with any process that Plaintiff did not develop or authorize;

8. Declaratory relief as set forth in Count IX;

9. An order requiring Defendants to provide a complete accounting of all third parties who have accessed the facility or received Confidential Information;

10. Compensatory damages for breach of the Existing Equipment Agreement and the Fourth MLA;

11. Compensatory and punitive damages against Defendant Bostic;

12. Pre-judgment and post-judgment interest;

13. Attorneys' fees and costs;

14. An order requiring Defendants to immediately cease all electrical energization and preparation for operation of any equipment at the Podrute Facility until CE compliance is obtained and verified, given the documented safety risks including the facility's proximity to a high-pressure gas line and the history of transformer failures;

15. An order requiring Defendants to identify all persons who have accessed, viewed, or participated in the preparation of documents purporting to assign manufacturer status or CE obligations to Plaintiff; and

16. Such other and further relief as this Court deems just and proper.

## <u>RESERVATION OF RIGHTS</u>

Plaintiff expressly reserves all rights to seek additional relief by amendment, supplemental complaint, or separate proceeding, including but not limited to: claims for termination of the Fourth MLA and companion agreements; claims for declaratory judgment regarding the validity,

enforceability, and scope of the Mutual Release; claims for rescission; claims arising from unauthorized filings with the United States Patent and Trademark Office; claims for breach of additional provisions of the Fourth MLA; and claims that may be asserted individually or jointly with Ecogensus, LLC, its founder, or any affiliated entity. This reservation extends to claims arising from facts discovered during the course of this litigation and to claims against any individual or entity that participates in retaliatory conduct, obstruction, spoliation, or further unauthorized disclosure following the filing of this action.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**SRF TECHNOLOGY LICENSING**

**EUROPE EAST, LLC**

By: _____

Debra Yang

DY1102

Michael S. Baker, P.C.

167 Madison Avenue, Suite 205-6001

New York, New York 10016

(646) 212-0194

info@nybusiness.law

*Attorneys for Plaintiff*

Dated: March 16, 2026

## EXHIBIT LIST

**Exhibit A:**   Text messages from Curtis Bostic to SRF representative, February 2026

**Exhibit B:**   March 2026 correspondence from Jozinović to Frank Harris requesting execution of power of attorney designating Ecogensus as "manufacturer-supplier" (March 6 email, POA attachment, March 11 follow-up)

**Exhibit C:**   Letter from Eko udruga "Naš zavičaj" to Ecogensus, dated December 18, 2025, with photographs

**Exhibit D:**   HRT (Croatian National Television) report, July 16, 2022, quoting ZGW Croatia official statement describing "vacuum pyrolysis" at "maximum temperature of 240 degrees Celsius" (translated excerpt)

**Exhibit E:**   Danica.hr report, November 20, 2025, reporting conviction of Mladen Jozinović by County Court in Varaždin, 30 months unconditional imprisonment (translated excerpt)

**Exhibit F:**   Email from Austin Champion, Champion LLP, stating "I am the only attorney representing ZGW and have been for some time"

**Exhibit G:**   Request for Mediation filed by Zero Global Waste, LLC through Champion LLP, dated October 27, 2025

**Exhibit H:**   Existing Equipment Supplemental Agreement, dated February 2, 2023

**Exhibit I:**   Mutual Release, dated February 2, 2023

**Exhibit J:**   Fourth Amended and Restated Master License and Equipment Supply Agreement, dated February 2, 2023

**Exhibit K:**   Zero Global Waste Q3 2021 Partners Update (excerpt)